40 P.3d 1035 (2001)
131 N.M. 578
2002-NMCA-020
STATE of New Mexico, Plaintiff-Appellee,
v.
Kent CHRISTMAS, Defendant-Appellant.
No. 21,699.
Court of Appeals of New Mexico.
December 28, 2001.
Certiorari Denied February 6, 2002.
*1036 Patricia A. Madrid, Attorney General, William McEuen, Assistant Attorney General, Santa Fe, NM, for Appellee.
Sigmund L. Bloom, Albuquerque, NM, D. Eric Hannum, Albuquerque, NM, for Appellant.
Certiorari Denied, No. 27,313, February 6, 2002.

OPINION
BOSSON, Chief Judge.
{1} Defendant was convicted of driving under the influence of intoxicating liquor (DWI), contrary to NMSA 1978, § 66-8-102(A), (C) (1999). On appeal, Defendant argues (1) the trial court abused its discretion in admitting the results of breath-alcohol testing when the breathalyzer machine's internal calibration check may not have been operational at the time of testing, (2) the trial court abused its discretion in denying Defendant's motion for a mistrial in light of inadmissible testimony regarding the horizontal gaze nystagmus (HGN) test, (3) the evidence was insufficient to support Defendant's DWI conviction because the State did not introduce evidence relating Defendant's breath-alcohol *1037 test results back to a particular breath-alcohol content at the time of driving, and (4) the trial court erred in declining Defendant's request for a special verdict form.
{2} As to Defendant's first three arguments, we affirm the trial court. Our disposition of the first three arguments makes it unnecessary to decide Defendant's fourth argument.

BACKGROUND
{3} Shortly before 1:00 a.m. on December 20, 1998, Officer Thomas Harzewski observed Defendant's vehicle driving on Interstate 25 and noticed that the license plate light was not operational. Officer Harzewski began to follow Defendant and observed Defendant's vehicle crossing the center line. When Officer Harzewski pulled Defendant over, he noticed the odor of alcohol. When Defendant was asked if he had been drinking, he acknowledged that he had consumed alcohol earlier, but said he had "slept some" in the interim before driving. Officer Harzewski conducted three field sobriety tests: the HGN test, the one leg stand test, and the walk and turn test.
{4} Officer Harzewski testified that Defendant did "fairly well" on the one leg stand test. Although the officer indicated at trial that there were some minor "clues" of possible intoxication in Defendant's performance, he decided to give Defendant the benefit of the doubt and passed him on that test.
{5} Defendant did not perform as well on the walk and turn test. Officer Harzewski testified that: Defendant failed to follow instructions, he had to ask how many steps he had taken so far, he failed to walk a straight line, and he failed to place his heel near his toe at almost every step. The officer gave Defendant two chances to perform the walk and turn before determining that he had failed that test. Additionally, Officer Harzewski testified that Defendant appeared "agitated," displayed an "aggravated attitude," and seemed "a little bit nervous."
{6} Defendant was arrested and brought to the Truth or Consequences police station, where a breath-alcohol test was administered by Officer Harzewski utilizing a breathalyzer machine. Defendant registered a .09 breath-alcohol concentration (BAC) at 1:44 a.m., and a .08 level at 1:47 a.m., about an hour after Defendant had stopped driving. At 1:45 a.m., in the interval between the two tests administered to Defendant, the machine's internal calibration check produced a reading of .000.
{7} Defendant was charged with DWI and eventually convicted by a jury. He now appeals that conviction.

DISCUSSION

Admissibility of the Breath-Alcohol Test
{8} We review the trial court's evidentiary rulings for abuse of discretion. See State v. Woodward, 1996-NMSC-012, ¶ 6, 121 N.M. 1, 908 P.2d 231, rev'd on other grounds by Woodward v. Williams, 263 F.3d 1135 (10th Cir.2001). "`An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason.'" Id. (quoting State v. Apodaca, 118 N.M. 762, 770, 887 P.2d 756, 764 (1994); accord State v. Rojo, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829.
{9} In the interval between the two breath tests taken by Defendant, the breathalyzer machine registered .000 on an automatic internal calibration check. This reading was an anomaly. The automatic calibration check involved a .08 simulator and should have yielded a reading of between .07 and .09. The anomalous internal calibration reading was the subject of a pretrial defense motion to suppress all breathalyzer test results, which was denied by the court.
{10} Because an issue was raised regarding the validity of the breathalyzer test results, the State was required to make some threshold showing regarding the proper functioning of the machine. See Bransford v. State Taxation & Revenue Dep't, 1998-NMCA-077, ¶ 7, 125 N.M. 285, 960 P.2d 827; Plummer v. Devore, 114 N.M. 243, 245, 836 P.2d 1264, 1266 (Ct.App.1992). In response, the State put on evidence that the *1038 machine had been properly calibrated within one week of Defendant's test. See State v. Cavanaugh, 116 N.M. 826, 829, 867 P.2d 1208, 1211 (Ct.App.1993) (stating foundation for admission of breathalyzer may be established by evidence that machine had been calibrated within one week of a defendant's breath test). A certified key operator had checked the calibration of the breathalyzer machine on December 14 and December 21 and had determined that it was within the tolerances allowed by the Scientific Lab Division of the New Mexico Department of Health. The Truth or Consequences police department regularly calibrated the machine every five to seven days. There was testimony that the Scientific Lab Division does not require an internal calibration check at the time a breathalyzer test is actually administered, as was done in this instance.
{11} The State also introduced evidence that the anomalous internal calibration reading did not affect the reliability of the test. See State v. Smith, 1999-NMCA-154, ¶ 10, 128 N.M. 467, 994 P.2d 47 (holding the state can meet threshold showing of a breathalyzer machine's validity by presenting evidence sufficient to support a finding that the particular test was capable of producing valid results). Officer Harzewski, who administered Defendant's breath-alcohol test, did not think the .000 reading was significant because the breathalyzer machine did not give a "fail" message, which appears when there is an internal failure, radio interference, or some other problem with the equipment. The certified key operator testified that the .000 reading was likely caused by one of the solution hoses not being hooked up to the machine at the time of the test. According to the key operator, the internal calibration system is separate from the system that administers the breath test and does not affect the results. Another officer testified that he likely left the hoses unattached after conducting a radio interference check on the machine two days before Defendant's test, and he believed this to be the cause of the.000 internal calibration reading. If the machine ran an internal calibration check while the hose to the simulator standard was disconnected, the machine would normally produce a result of .000 because it would be reading air from the room and not from the simulator.
{12} The trial court was satisfied with the evidence of proper calibration and functioning of the breathalyzer machine, and we agree that the court did not abuse its discretion in coming to that determination. We conclude that any discrepancy in regard to the validity of Defendant's breathalyzer results went to the weight of the evidence to be considered by the jury. See, e.g., State v. Anderson, 118 N.M. 284, 303, 881 P.2d 29, 48 (1994) (recognizing questions concerning test results or statistical probabilities go to the weight of the evidence and are the concerns of the fact finder); State v. Vialpando, 93 N.M. 289, 292, 599 P.2d 1086, 1089 (Ct.App. 1979) (same)

Defendant's Motion for Mistrial Regarding the HGN Test
{13} Defendant argues that the trial court abused its discretion in denying his motion for a mistrial after Officer Harzewski made an impermissible reference to the HGN test in his testimony. See State v. McDonald, 1998-NMSC-034, ¶ 26, 126 N.M. 44, 966 P.2d 752 (holding denial of mistrial will not be disturbed absent a showing of abuse of discretion). In State v. Torres, 1999-NMSC-010, ¶ 30, 127 N.M. 20, 976 P.2d 20, our Supreme Court held that the results of HGN testing constitute scientific evidence that must meet the standard of evidentiary reliability articulated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 587-89, 593-94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (holding that scientific evidence must be shown to be not only relevant, but also reliable), and State v. Alberico, 116 N.M. 156, 167-68, 861 P.2d 192, 203-04 (1993). In the absence of evidence verifying the reliability of HGN testing, the results are inadmissible. See Torres, 1999-NMSC-010, ¶ 54, 127 N.M. 20, 976 P.2d 20.
{14} At Defendant's trial, Officer Harzewski testified that he administered three field sobriety tests, including the HGN test. At this point, the State specifically asked Officer Harzewski how Defendant had performed "with respect to the last [other] two tests." *1039 In his reply, Officer Harzewski made an impermissible reference to the HGN test by stating that Defendant "didn't pass that one."
{15} At the bench, Defendant made a motion for mistrial, which was denied. The prosecutor indicated that she had not intended to elicit any testimony regarding HGN, and had sought to avoid doing so by specifically asking the officer how Defendant performed on the two admissible field sobriety tests. The trial judge promptly gave a curative instruction, admonishing the jury to disregard "any testimony relating to the so-called HGN test," and instructing them to "not ... take this into account in any way."
{16} Defendant argues that this curative instruction did not ameliorate the unfair prejudice resulting from Officer Harzewski's reference to the HGN test. We are not persuaded. We have previously held that a prompt admonition from the trial court to the jury to disregard an unsolicited reference to inadmissible evidence is generally sufficient to cure any prejudice. State v. Newman, 109 N.M. 263, 267, 784 P.2d 1006, 1010 (Ct.App. 1989); State v. Gardner, 103 N.M. 320, 323, 706 P.2d 862, 865 (Ct.App.1985). Defendant has not shown that he suffered any particular prejudice as a result of Officer Harzewski's momentary reference to the HGN test. Even if we deemed the judge's curative instruction ineffective to remedy any prejudice, there was so much other evidence probative of Defendant's intoxication that the officer's fleeting reference to the HGN test would have been mere harmless error. See Sanchez v. State, 103 N.M. 25, 27, 702 P.2d 345, 347 (1985) (stating the test for harmless error).

Breath-Alcohol Level at the Time of Driving
{17} In reviewing the sufficiency of evidence to support a conviction, this Court must "resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." State v. Foster, 1999-NMSC-007, ¶ 42, 126 N.M. 646, 974 P.2d 140; accord State v. Sanders, 117 N.M. 452, 456, 872 P.2d 870, 874 (1994). "The reviewing court does not weigh the evidence or substitute its judgment for that of the fact finder as long as there is sufficient evidence to support the verdict." State v. Mora, 1997-NMSC-060, ¶ 27, 124 N.M. 346, 950 P.2d 789. This standard does not require us to consider the "`merit of evidence that may have supported a verdict to the contrary.'" State v. Kersey, 120 N.M. 517, 520, 903 P.2d 828, 831 (1995) (quoting State v. Vigil, 110 N.M. 254, 256, 794 P.2d 728, 730 (1990)). Rather, we must determine whether the evidence presented could justify, to a reasonable mind, a finding that each element of the crime charged has been established beyond a reasonable doubt. See State v. Coffin, 1999-NMSC-038, ¶ 73, 128 N.M. 192, 991 P.2d 477; State v. Salgado, 1999-NMSC-008, ¶ 25, 126 N.M. 691, 974 P.2d 661.
{18} Defendant was convicted of DWI, by general verdict, contrary to Section 66-8-102(A), (C). Subsection A of this statute provides that a person may commit DWI by being "under the influence of intoxicating liquor" while driving a vehicle. Subsection C describes the per se offense of driving with "an alcohol concentration of eight one-hundredths [.08] or more in his blood or breath." The jury was instructed that its verdict must be "unanimous as to the way or ways in which the offense was committed."
{19} Defendant does not argue that the evidence was insufficient to convict him under Subsection A; he contends only that the evidence was insufficient under Subsection C, the per se section of the statute. Defendant contends that the State did not relate his breath-alcohol test score back to the time of driving, an hour earlier. Because this was a general verdict and the jury might have convicted Defendant solely on the basis of Subsection C, we must determine the sufficiency of the evidence to support such a conviction.
{20} The per se offense under Subsection C relates to the time of driving. The Uniform Jury Instruction promulgated by our Supreme Court for Section 66-8-102(C) states that, to be convicted of per se DWI, the accused must have had a .08 level or greater "[a]t that time," referring to the time of driving. See UJI 14-4503 NMRA 2001. We have noted that "[t]iming is an essential *1040 element of the crime ... [requiring that the State] prove a nexus between a BAC [blood or breath-alcohol concentration] of 0.08 or more and the time `defendant operated a motor vehicle.'" State v. Baldwin, 2001-NMCA-063, ¶ 8, 130 N.M. 705, 30 P.3d 394 (quoting UJI 14-4503). As we stated in Baldwin with regard to marginal BAC results only at or slightly above the legal limit, "[t]he longer the delay between the time of [the] incident and [the] sample collection, the more difficult it becomes, scientifically, to draw reasonable inferences from one `data point,' back to the `driving' time." Id. ¶ 17 (quoting E. Fitzgerald & D. Hume, Intoxication Test Evidence: Criminal and Civil § 2:30 [Lawyer's Co-op (1987 & 1994 Supp.)]). In Baldwin, two hours and fifteen minutes elapsed from the time of driving until blood testing was completed, and we reversed. See Baldwin, 2001-NMCA-063, ¶¶ 2, 4, 130 N.M. 705, 30 P.3d 394; cf. Cavanaugh, 116 N.M. at 830-31, 867 P.2d at 1212-13. The question is whether a lapse of only an hour requires specific relation-back testimony or other corroborating evidence as in Baldwin.
{21} Other courts that have reversed DWI convictions based upon a lack of relation-back evidence have done so when there is a significant time lapse between the time of driving and the time of BAC testing, usually two hours or more. See, e.g., State v. Gallow, 185 Ariz. 219, 914 P.2d 1311, 1313 (App.1995) (stating when BAC level taken within two hours of driving and the State's criminologist could not testify that the defendant's BAC at the time of driving exceeded the statutory limit beyond a reasonable doubt, the jury was not permitted to make such an inference); Haas v. State, 597 So.2d 770, 775-76 (Fla.1992) (Kogan, J., concurring in part, dissenting in part) (holding that it would amount to a due process violation to allow the state to presume defendant's BAC at the time of driving from test results taken several hours later); Commonwealth v. Barud, 545 Pa. 297, 681 A.2d 162, 166-67 (1996) (holding that a statute permitting conviction based on a BAC taken three hours after driving was unconstitutional); Commonwealth v. Modaffare, 529 Pa. 101, 601 A.2d 1233, 1234-35 (1992) (reversing DWI conviction where a marginal BAC level was taken almost two hours after driving and there was no corroborating evidence probative of intoxication), superceded by statute as stated in Commonwealth v. Brehm, 444 Pa.Super. 138, 663 A.2d 712, 719 (1995).
{22} By contrast to this case law and pertinent New Mexico cases, Defendant's BAC level was measured only one hour after he was stopped by Officer Harzewski, making it less difficult to establish a relation-back nexus than if more time had elapsed. See Baldwin, 2001-NMCA-063, ¶ 18, 130 N.M. 705, 30 P.3d 394 (citing cases where longer delays in BAC testing, and insufficient relation-back evidence, resulted in DWI reversals). As we said in Baldwin, it would be preferable if the legislature would prescribe a relation-back period by statute so that a jury could rely on a subsequent, timely BAC test result as a presumptive surrogate for what the BAC likely was at the time of driving. See id. ¶ 19. In the absence of a statutorily defined relation-back period, we must look to legislative intent for guidance with regard to what the legislature envisioned when it presented a per se offense at the time of driving.
{23} It would be foolhardy to think that the legislature contemplated that BAC readings could be obtained simultaneously with the act of driving. Some reasonable delay is inevitable because of the time required to stop and question a suspect, conduct field sobriety testing, complete an arrest, transport the suspect to a testing site with a properly calibrated breathalyzer machine, and conduct the requisite twenty-minute observation period before breath testing. See, e.g., State v. Gardner, 1998-NMCA-160, ¶ 5, 126 N.M. 125, 967 P.2d 465 (holding breath-alcohol test results inadmissible unless officer complies with twenty-minute continuous observation period). We assume the legislature was aware of this fact. See State v. Gutierrez, 115 N.M. 551, 552, 854 P.2d 878, 879 (Ct.App.1993) (stating that statute must not be interpreted in a way that will produce an absurd result and may be construed to avoid such a result). We believe that both the legislature and our Supreme Court contemplated tolerance of some reasonable and *1041 inevitable delay in testing, and intended that otherwise valid test results would be admitted into evidence notwithstanding such a delay.
{24} The delay in this case brings to bear the factors discussed in Baldwin, which should be considered on a sliding scale. These factors include: how long is the delay; how much the BAC test results exceed the statutory limit; and the existence of other corroborating behavioral evidence. See Baldwin, 2001-NMCA-063, ¶ 23, 130 N.M. 705, 30 P.3d 394; Cavanaugh, 116 N.M. at 826-30, 867 P.2d at 1208-12; Commonwealth v. Osborne, 414 Pa.Super. 124, 606 A.2d 529, 531 (1992) ("[T]he stronger the inference of guilt, the less significant is the necessity for evidence of relating back. Conversely, the weaker the inference of guilt, the more vital is the necessity for evidence of relating back an accused's BAC test result to the time of driving.").
{25} In the case at bar, the delay between the time of driving and the time of testing did not exceed one hour. It is difficult to envision a reasonable delay of anything less than an hour from the time of driving to the time of testing, given all the events that must usually take place in the interim. In addition, there was evidence at trial from which the jury could have drawn a rational inference that Defendant's BAC at the time of driving was actually higher than the .08 and.09 readings obtained at the time of testing. That evidence follows.
{26} Defendant's expert witness, Dr. Reyes testified about the physiological consequences of alcohol ingestion and how difficult it is to extrapolate backward in time from a BAC test administered at a later time. Dr. Reyes explained that when alcohol is ingested, it travels first to the stomach, and is eventually absorbed into the bloodstream. During this first stage, or "absorption stage," an individual's BAC continues to rise. However, absorption rates can vary tremendously, based on any number of anatomical, physiological, and situational factors. At some point, the alcohol level in a person's blood or breath reaches a second stage, or "peak level." After the BAC reaches a peak, an individual enters the so-called "elimination phase," as alcohol is metabolized by the body and the BAC level begins to decline. Dr. Reyes testified that these three phases can overlap, because the body begins the process of elimination even as it may still be absorbing alcohol, and described this phenomena as an "alcohol time response curve," that can vary greatly with the individual and the situation. Because it is not always possible to tell whether an individual's BAC was on the rise, at its peak, or on the decline at some earlier point in time, like the time of driving, Dr. Reyes warned against trying to use a subsequent BAC test score to calculate an individual's BAC at the time of driving.
{27} A jury is not, however, bound by an expert's conclusion. State v. Chamberlain, 112 N.M. 723, 732, 819 P.2d 673, 682 (1991). The jury was free to reject Defendant's version of the facts, while nonetheless being informed by Dr. Reyes' explanation of the alcohol time response curve. State v. Huff, 1998-NMCA-075, ¶ 11, 125 N.M. 254, 960 P.2d 342. We view the evidence in the light most favorable to support the verdict. Foster, 1999-NMSC-007, ¶ 42, 126 N.M. 646, 974 P.2d 140.
{28} Based on Defendant's own admission that he had "slept some" after drinking but before taking the wheel, coupled with the additional hour that passed before BAC testing, and based on Dr. Reyes' testimony, the jury could reasonably have inferred that Defendant's BAC had "peaked" earlier in the evening, and that he was well into the "elimination stage" at the time of BAC testing. If this was the case, then Defendant's BAC level at the time of driving would have been higher, not lower, than the BAC level recorded by the breathalyzer tests. This inference, fully supported by the evidence, would support a conclusion that Defendant was driving with a BAC over the legal limit. Defendant offered no specific evidence to support a theory that his blood-alcohol level may have "peaked" at some point after he actually operated his vehicle. Cf. Modaffare, 601 A.2d at 1236 (reversing conviction where physician testified that defendant's BAC may have peaked after the time of driving). In addition, the evidence was that Defendant *1042 failed one field sobriety test, was given the benefit of the doubt on another on which his performance was marginal, was driving erratically, and responded in a nervous and agitated way when stopped.
{29} For all the foregoing reasons we conclude that the jury verdict is supported by substantial evidence. The evidence supports the DWI verdict regardless of whether the jury found Defendant guilty under Section 66-8-102(A) or (C), or both.

The Lack of a Special Verdict
{30} Defendant argues that the jury should have been given a special verdict form that would indicate the theory or theories upon which the jury convicted him of DWI Section 66-8-102(A) or (C), or both. We agree that if the evidence in this case were insufficient to sustain a conviction under one statutory theory, but sufficient under the other theory, a special verdict would have been helpful to this Court on appeal. However, as previously discussed, we are satisfied that the evidence supports a conviction under either theory, and therefore the lack of a special verdict, if error, is inconsequential to this appeal.

CONCLUSION
{31} We affirm Defendant's conviction for DWI.
{32} IT IS SO ORDERED.
WE CONCUR: LYNN PICKARD, Judge, and CYNTHIA A. FRY, Judge.